IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

MICHAEL STANDFAST, )
)
Plaintiff, )
)
v. )       Case No.
)       11-5047-CV-SW-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security, )
)
Defendant. )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Standfast seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and XVI of

the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to order

psychological testing to evaluate plaintiff's somatoform disorder.[1] I find that the substantial

evidence in the record supports the ALJ's finding that plaintiff is not disabled. Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the Commissioner

will be affirmed.

## I.    BACKGROUND

On October 19, 2006, plaintiff applied for disability benefits alleging that he had been

disabled since November 12, 2004. Plaintiff alleged that his disability stems from pancreatic

failure. Plaintiff's application was denied on January 9, 2007. On April 1, 2009, a hearing

was held before an Administrative Law Judge. Supplemental hearings were held on August 19,

2009, and September 21, 2009. On September 29, 2009, the ALJ found that plaintiff was not

under a "disability" as defined in the Act. On March 23, 2011, the Appeals Council denied

---

[1]Any of a group of disorders characterized by symptoms suggesting physical illness or
disease for which there are no demonstrable organic causes or physiologic dysfunctions. The
symptoms are usually the physical manifestations of some unresolved intrapsychic factor or
conflict.

plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5.      Does the impairment prevent the claimant from doing any other work?

>        Yes = disabled.
>        No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff, vocational expert Steven Kuhn, and

medical expert Dr. Morris Alex in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1972 through 2008:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1972 | $ 351.64 | 1991 | $ 4,640.76 |
| 1973 | 1,437.49 | 1992 | 0.00 |
| 1974 | 4,758.74 | 1993 | 0.00 |
| 1975 | 6,065.53 | 1994 | 0.00 |
| 1976 | 6,496.54 | 1995 | 19,085.17 |
| 1977 | 4,854.67 | 1996 | 5,817.52 |
| 1978 | 8,234.60 | 1997 | 32,378.17 |
| 1979 | 16,743.91 | 1998 | 28,057.92 |
| 1980 | 16,536.00 | 1999 | 27,565.36 |
| 1981 | 9,583.15 | 2000 | 32,111.68 |
| 1982 | 4,891.59 | 2001 | 30,783.81 |
| 1983 | 0.00 | 2002 | 33,077.51 |
| 1984 | 469.00 | 2003 | 34,050.14 |

| 1985 | 4,279.07 | 2004 | 34,352.28 |
| 1986 | 9,721.70 | 2005 | 3,953.00 |
| 1987 | 962.45 | 2006 | 0.00 |
| 1988 | 3,315.00 | 2007 | 208.00 |
| 1989 | 11,972.64 | 2008 | 0.00 |
| 2990 | 11,874.66 | | |

(Tr. at 253).

## Function Report – Adult

In a Function Report completed November 14, 2006, plaintiff described his day as follows: He gets up, lays out his child's clothes (his child is a profoundly disabled teenager), helps the child to the toilet and then to the bath, he helps the child get dressed and get on the bus. He then recovers from helping the child get ready for school. He feeds and waters his dogs, checks on his in-laws to see if they need anything and makes sure they took their medicine, tries to do outside chores, does laundry, gets his child off the bus, helps him with his homework, fixes dinner, helps his child get ready for bed, puts the child to bed, then goes to sleep himself (Tr. at 270, 276). Despite plaintiff being the one who makes sure his in-laws have taken their medicine, he claims that he needs reminders himself to take his own medicine (Tr. at 271).

Plaintiff is able to make hot dogs, hamburgers, frozen dinners, and full meals with two or three courses (Tr. at 271). He does laundry and some household repairs (Tr. at 271). Plaintiff goes out of his home daily by walking and driving a car (Tr. at 272). He is able to shop for food and other household supplies as well as repair parts (Tr. at 272). He fishes once every month or two; he hunts about once a year (Tr. at 273).

5

Plaintiff's condition affects his ability to lift, squat, bend, complete tasks, concentrate, and get along with others; and it affects his memory (Tr. at 274). It does not affect his ability to stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, understand, follow instructions, or use his hands (Tr. at 274). Despite indicating that his condition does not affect his ability to walk, plaintiff stated that he could only walk about 100 yards (Tr. at 274). Plaintiff indicated that he is afraid he will die in two to four years if he cannot get the needed medical procedures, because the condition is terminal and his father died of the same condition (Tr. at 276).

**Disability Report**

In an undated disability report, plaintiff indicated that he is 6'1" tall and weighs 190 pounds, he suffers from pancreatic failure, he is in constant pain and has uncontrollable bowel movements, he cannot stand for more than an hour without having to sit down for a couple of hours, and he started working eight hours per week as a driver in September 2006 (after his alleged onset date) (Tr. at 278).

**Interrogatories**

On March 31, 2009, plaintiff completed a set of interrogatories (Tr. at 309-316). He indicated that he worked the following hours as a subcontractor, all of which are after his alleged onset date and for which he received $10 per hour:

     April 26 2006 - 9 hours

     October 11, 2006 - 20 hours (several days)

     November 8, 2006 - 10 hours

     November 20, 2006 - 12 hours

     December 28, 2006 - 6 hours

     April 26, 2007 - 5 hours

April 27, 2007 - 5 hours

April 30, 2007 - 5 hours

Plaintiff reported that he is in constant pain at a level of 8-10 on a scale of 1 to 10, he has uncontrolled bowel movements, he urinates every 35 to 40 minutes, he passes out after eating and cannot be awakened, he has short-term memory loss and sleep loss, he has degenerative bone disease in his hips, and he is always fatigued and without energy (Tr. at 309).

Plaintiff takes Neurontin five times a day; it controls spasms and dulls the pain, but does not alleviate it (Tr. at 311). Plaintiff can walk for 30 minutes at a time, stand for 30 minutes at a time, and sit for one hour at a time (Tr. at 313). He can stand for 1 to 2 hours total, walk for 1 to 2 hours total, and sit for 1 to 1 1/2 hours total (Tr. at 313). He can pick up 15 pounds with one hand and 30 to 40 pounds with both hands but only occasionally (Tr. at 313). He drives for 20 to 30 minutes at a time two to three times per week (Tr. at 313). Plaintiff tries to "move around and walk" for exercise (Tr. at 315).

Plaintiff described his day as follows: He wakes up at 2:00 a.m. due to pain, he urinates, gets a drink, attempts to go back to sleep, always has to sleep sitting up. He wakes up at 4:30 to 5:00, urinates, takes a shower, gets dressed, feeds and waters the dog, walks around to get comfortable. By mid morning he has already had a couple of bowel movements and he only eats one time per day. He may watch television or go outside and walk around, then he does laundry and sits around. He takes care of anything that needs to be done outside. For the rest of the afternoon, he sits, stands, and walks as his pain allows. Some days he cannot move at all. He sometimes fixes dinner. "May pass out after eating until midnight" or he may watch television until his wife comes home.

7

*B.      SUMMARY OF TESTIMONY*

<u>April 1, 20009</u>

The current case is plaintiff's second application for disability benefits (Tr. at 100). Plaintiff applied for disability in 1990 due to an injury to his right hand (Tr. at 100). A piece of sheet metal went through the wrist area, and he had 13 surgeries which kept him out of work for two years (Tr. at 100). Plaintiff thereafter returned to full-time work (Tr. at 101).

This application was filed in 2006 (Tr. at 100). At the initial stage, his application was denied and SSA said that plaintiff was non-cooperative (Tr. at 101). An informal remand occurred in the summer of 2008, the application was reviewed again and denied (Tr. at 101).

The ALJ stated that the file did not contain records of Dr. McCallum whom plaintiff claimed had diagnosed pancreatic failure requiring a pancreas transplant. Therefore, the hearing was postponed and plaintiff's counsel was directed to obtain those records. Additionally the ALJ ordered a consultative examination.

<u>August 19, 2009</u>

Plaintiff last saw a doctor a year and two months before the hearing (Tr. at 103). That doctor told him he needed to get someone "closer to" him to take his case, and he finally found someone three weeks earlier who would see him (Tr. at 103). Plaintiff has been on Neurontin[2] for the past year, but no other medication (Tr. at 104). He saw a physician's assistant at Ozarks Community Health about three weeks earlier to renew his Neurontin prescription (Tr. at 104-105).

Plaintiff saw Dr. McCallum at KU Medical Center (Tr. at 105). That doctor said he would not operate because there was "too much else going on" when he looked at plaintiff's

_____

[2]Used to control seizures and nerve pain.

8

records (Tr. at 105-106). Plaintiff was told to go home, and the doctor said he would be contacted "when we have it worked out." (Tr. at 106). That was in 2006 (Tr. at 107). The record did not contain any records from Dr. McCallum so the ALJ continued the hearing, instructed plaintiff to obtain those medical records and ask Dr. McCallum to complete a form listing any work restrictions (Tr. at 108). Plaintiff indicated he would contact Dr. McCallum, tell him plaintiff is trying to get disability, and see if he would send a letter listing any recommendations (Tr. at 109). The ALJ ordered a consultative exam (Tr. at 110).

Plaintiff's attorney stated that plaintiff is not alleging a mental impairment (Tr. at 28).

1. **Plaintiff's testimony.**

At the time of this hearing plaintiff was 54 years of age (Tr. at 31). He studied electronics in college for three years, earning a 3.2 to 3.5 GPA (Tr. at 31). Plaintiff had been married for 14 years (Tr. at 32). Plaintiff has a 20-year-old step son who lives with him and his wife (Tr. at 32). Plaintiff's wife is a licensed practical nurse for Austin Home Health Care (Tr. at 32).

Plaintiff's work history mostly consists of aircraft avionics and working as an aircraft and power plant mechanic (Tr. at 32-33). Plaintiff went back to school because the aircraft business was laying everyone off, and then he worked for three years as a lab assistant at Savannah City Hospital (Tr. at 33). After that, he was able to get a job at Cessna again (Tr. at 34). Plaintiff did not work in 1992, 1993 and 1994 -- he was recovering from a work-related injury to his hand and had a worker's compensation claim on that (Tr. at 34). When asked if he has any current restrictions on his hand, he said, "I'm right handed normally. I cannot remember exactly what they're supposed to be." (Tr. at 34). At Cessna he was not able to use vibrating tools for anything more than 35 to 40 minutes (Tr. at 34-35). He used his hands constantly or most of the time at Cessna (Tr. at 35).

9

While plaintiff was working at Cessna he was taking evening classes (Tr. at 35). In 2003 he graduated with an associate degree to be a laboratory technician[3] (Tr. at 35). Plaintiff has never looked for work in the medical laboratory field (Tr. at 36). He worked at Cessna until November 2004 (Tr. at 36). He had been off work for two days with the flu (Tr. at 36). He went to the doctor and was told he needed an endoscopy (Tr. at 36). He had that done and also had MRIs, CT scans, arteriograms, and exploratory surgery in an effort to determine what was wrong with him (Tr. at 36). That was done at Wesley Medical Center in Wichita (Tr. at 37). That doctor sent him to KU Medical Center, and there Dr. McGowan told plaintiff he was going into pancreatic failure and would need a new pancreas (Tr. at 38). Plaintiff saw a surgeon who said he was not going to remove plaintiff's gall bladder because there was "too much else going on" (Tr. at 38). He told plaintiff to go home, and they would contact him when they figured out what they were going to do (Tr. at 38). He went home and kept calling them, but he has never gotten an answer as to what was going to be done (Tr. at 39).

In the meantime plaintiff had a family doctor, Dr. McDermott, who believed it was more than likely plaintiff's pancreas causing the problem (Tr. at 39). "[H]e would -- he just, can do a follow up and wait. The main thing, the reason why was I have no insurance and no money. He's the only one that would actually see me." (Tr. at 39). Plaintiff's treatment

---

[3]The testimony went as follows:
Q. Now I'm showing at one point you said you graduated from college in 2003.
A. I went through the technical college and graduated in it, yes.
Q. Okay. So --
A. -- as a laboratory technician.
Q. All right. So while you were working at Cessna were you also going to college?
A. I was taking classes in the evening, yes.
Q. And what is the degree that you got in 2003?
A. [inaudible] Associate's degree is all I know of in medical laboratory.
Q. Tell me again, it was in medical laboratory?
A. As far as I know, yes, I met all the requirements for the Associate's Degree.
(Tr. at 35-36).

consists of Neurontin (Tr. at 39). Neurontin numbs his pain and controls the nerve spasms (Tr. at 42).

Plaintiff does not drink alcohol (Tr. at 40). Dr. McGowan and Dr. McDermott wrote letters saying he could not work (Tr. at 41). Plaintiff has never received a release to return to work (Tr. at 41). Plaintiff does not know, then, why he stopped getting private disability payments -- he surmised that it was because Cessna is self-insured and wanted to save money (Tr. at 41).

Plaintiff's pain is constant and sometimes gets worse (Tr. at 42). Since his alleged onset date, he has had to be "sedated and put to sleep" because of his pain two or three times (Tr. at 42). Plaintiff said this was done at the Savannah City Hospital (Tr. at 42).

When Cessna told plaintiff they would not rehire him, he moved to the country just outside of Springfield (Tr. at 43). He got a part time job driving, but he was terminated because he could not pass the "medical" (Tr. at 43). Plaintiff has a driver's license (Tr. at 43). Plaintiff worked about 30 hours a month in 2007 and 2008 transporting freight in a pickup (Tr. at 43). He was on call (Tr. at 43). He said he had to take a Department of Transportation physical and get a commercial driver's license (Tr. at 43-44). He was not told what part of the test he did not pass (Tr. at 44).

Plaintiff went to the hospital where he used to work to try to get a job in the labs; however, he cannot do that kind of work because he passes out, he has memory loss, and because of his memory loss he may mess up someone's lab results and cause someone to die (Tr. at 44). Although he was able to get through college, he now has memory loss caused by Neurontin (Tr. at 44). He tried a different drug, the name of which he did not remember, but it did not help and made his situation worse (Tr. at 44-45). If plaintiff does not take

Case 3:11-cv-05047-REL   Document 13   Filed 06/25/12   Page 11 of 46

Neurontin, he cannot function at all (Tr. at 45). The pain is constant, he rates it an 8/10 and after he eats it is a 10/10 (Tr. at 45).

Plaintiff has taken disability paperwork to his treating physicians and "called and called and called" but the doctors are sitting on the paperwork (Tr. at 45-46).

Plaintiff was asked to describe his normal day:

I, sometimes I'm up at 1:00 in the morning. Sometimes I'm up at 3:00, 4:00, or 5:00. There's no, no time. And then I may not go to sleep until 11:00 or 12:00. When I wake up I cannot go back to sleep. I've tried. The other thing is possibly one, this has gotten worse because sometimes after I eat, is I will just pass out for hours. My wife has tried waking me during these times and has been unable. So she just lets me, she knows I need to rest, and just lets me sleep. And then if I did that while I was driving or doing that, working with somebody in the lab I don't know what would happen then.

(Tr. at 53).

Plaintiff has told his doctor about this and his doctor thought it might be plaintiff's reaction to the pain (Tr. at 53).

Plaintiff spends his day taking care of his 20-year-old step-son who ha congenital arthrogryposis -- over 60% of the joints in his body were not formed (Tr. at 46). He has had multiple surgeries at Shriner's Hospital to allow him now to walk with supporting devices, although he still cannot walk without assistance (Tr. at 46). He needs round-the-clock care (Tr. at 46-47). Although he is 20, he appears to be about 10 (Tr. at 47). When plaintiff was working, he had hired help to take care of his step-son and the school also provided help (Tr. at 47). The son can feed himself, but plaintiff does most of the cooking and the household chores (Tr. at 47). Plaintiff drives, and he lives on a 186-acre farm (Tr. at 48). Plaintiff uses his tractor to cut the grass and weeds, he fixes broken fences (Tr. at 48). He takes care of maintenance on the house (Tr. at 48). Plaintiff is a licensed fireworks technician -- he sets up and runs commercial fireworks displays for two different cities (Tr. at 48). He has had this license for five years (Tr. at 48). He has run fireworks displays for almost 11 years (Tr. at 48).

Case 3:11-cv-05047-REL   Document 13   Filed 06/25/12   Page 12 of 46

Plaintiff gets paid in cash, but he will call and ask for a 1099 (Tr. at 49).

When asked if his abdominal pain interferes with this work, plaintiff said it does -- he has had to turn it over to somebody else to do the work (Tr. at 49). He only supervises, and he was only there the last two years because he has the license (Tr. at 49).

Plaintiff has gone fishing about three times in the past year, four to five the year before (Tr. at 49-50). He used to fish every other day (Tr. at 50).

Plaintiff may have gone on a hunting trip one time in the last year, but he had to stop in the middle of it (Tr. at 50).

Plaintiff can no longer work as a lab tech or in avionics because every 30 to 45 minutes he has to use the bathroom (Tr. at 50). Dr. McGowan told plaintiff that his kidneys have taken over the functions of his pancreas (Tr. at 50). He also has short-term memory loss (Tr. at 51). Plaintiff's medication causes his ankles and feet to swell (Tr. at 51). Plaintiff sometimes has constant diarrhea for an hour at a time (Tr. at 52). This happens once or twice a week, sometimes four or five times a week (Tr. at 52). Plaintiff then changed his testimony and said it could go on for three hours (Tr. at 52). The pain causes plaintiff to have to get up and walk around, or to sit down -- he has to make these changes frequently (Tr. at 52). He can sit for 20 to 30 minutes before needing to get up and walk around for 10 to 20 minutes (Tr. at 52-53).

When asked for his current weight, plaintiff said he had not weighed in a couple of months so he had no idea (Tr. at 54). The ALJ asked what plaintiff weighed a couple months ago (Tr. at 54). Plaintiff said he weighed 240 a couple months ago and estimated that he currently weighed 200 (Tr. at 54). The ALJ responded, "Your weight was 218 in '06, 217 in '07, and 220 you think a couple of months ago. That's no weight loss. It looks like your weight has been very stable." (Tr. at 54). Plaintiff said that "when this first happened" he went from 220 to 185 pounds in 45 days (Tr. at 54). The medical records do not support this statement.

13

2.      **Vocational expert testimony.**

Vocational expert Steven Kuhn testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could perform medium exertional work; occasionally lift 50 pounds; frequently lift 25 pounds; sit for six hours a day, stand for six hours a day, and walk for six hours a day; and would need ready access to a bathroom several times a day (Tr. at 56). The vocational expert testified that such a person could perform all of plaintiff's past relevant work (Tr. at 57).

The second hypothetical involved a person who could perform light exertional work; could lift and carry 20 pounds occasionally and ten pounds frequently; no restriction in standing, sitting, or walking; and would need ready access to a bathroom several times a day (Tr. at 57). The vocational expert testified that such a person could perform plaintiff's past relevant work as a lab assistant and avionics worker (Tr. at 57).

The third hypothetical involved a person who could perform sedentary exertional work, could lift and carry a maximum of ten pounds, and would need ready access to a bathroom several times a day (Tr. at 57). The vocational expert testified that such a person could work as a sedentary laboratory assistant, DOT 041.381-010 (Tr. at 57, 60). There are approximately 7,000 sedentary lab assistant jobs in the region of Missouri, Kansas, Iowa and Nebraska (Tr. at 57).

The fourth hypothetical involved a person who could perform light exertional work, must do routine repetitive work at an SVP level of 1 or 2, who would not have extended concentration, and who would need ready access to a bathroom several times a day (Tr. at 58). The vocational expert testified that such a person would be able to work as a messenger, DOT 230.663-010, with approximately 4,000 jobs in the region and 147,000 jobs in the United States, or he could work as a general office clerk, DOT 245.367-014, with approximately

14

5,000 jobs in the region and 150,000 in the United States, or he could work as a production worker, DOT 524-687.022, with approximately 6,000 jobs in the region and 175,000 in the United States (Tr. at 58).

The fifth hypothetical involved a person with the limitations described by plaintiff -- the need to use the bathroom every 35 to 40 minutes, constant diarrhea up to five days per week for three hours at a time, short term memory loss, and constant pain and cramping (Tr. at 59). The vocational expert testified that such a person could not work (Tr. at 59-60).

The sixth hypothetical was based on plaintiff's interrogatory responses: the person could stand for two hours total, walk for two hours total, and sit for one and a half hours each day; sit for one hour at a time, stand for 30 minutes at a time, walk for 30 minutes at a time; could occasionally lift 30 to 40 pounds (Tr. at 60). The vocational expert testified that because such a person could not walk, stand and sit for a total of eight hours, he could not work (Tr. at 61).

September 21, 2009

A third hearing was held because the consultative exam had not been done by the time the second hearing took place (Tr. at 24). During the September 21, 2009, hearing, the following took place:

ALJ: Okay. So he got the short term disability and never worked after that and basically has not doctored or worked in about four years?

Attorney: That's correct, Judge, he's not had the funds or the insurance.

* * * * *

ALJ: Okay. so he had this evaluation at Kansas University and since then he has been alleging that he's on a pancreas list. Can -- will you stipulate that that's an exaggeration?

Attorney: As far as I'm aware of it, yes, I don't believe that he actually has been placed on a pancreas transplant list. My understanding from him is that without the insurance they wouldn't want to do it.

Case 3:11-cv-05047-REL   Document 13   Filed 06/25/12   Page 15 of 46

* * * * *

ALJ: . . . [W]ere the pancreatic enzymes, was that around 2005? Because since he, he had a gap of treatment for about three years. Then he went to Tall Grass Rural Clinic and they have not had him on pancreatic enzymes.

Attorney: I believe it was quite a ways back [inaudible]. Was that '05? He said that was correct.

ALJ: Okay. So in the last four years the only medications he's been on is Neurontin?

Attorney: . . . Oh, let me check. Have you been on Neurontin [inaudible]? He indicated Neurontin is the only medication that he's taking.

(Tr. at 74-76).

1.    **Plaintiff's testimony.**

At the time of this hearing, plaintiff was 54 years of age (Tr. at 79). During this

hearing, plaintiff denied that he had previously testified that he earned an Associate degree,

despite the fact that he had so testified (see footnote 3 on page 9):

Q.    Now during the time you worked at Cessna for ten years you said you took evening classes and you got an Associate's Degree in medical laboratory work, is that correct?

A.    No, I never said I got an Associate's Degree. I was taking classes towards getting that.

Q.    All right. How, how far did you get in your course work for medical lab?

A.    I had attended a one year course at a Voc center in Wichita, Kansas. And, and I was taking the required subjects to obtain that. I needed English and the psyche. I'd already acquired the math requirement and the general studies.

(Tr. at 79).

When asked why he had not worked in the last four years, plaintiff said, "Because I

have not been released by a doctor to return to work." (Tr. at 79). Plaintiff said he has

requested release to return to work from "every doctor I have seen" (Tr. at 80). Dr.

McDermott was the doctor who filled out paperwork saying plaintiff could not work (Tr. at

80). He was plaintiff's treating physician at the time, although plaintiff had worked for him

16

eight years before that (Tr. at 80). When asked what was his medical problem at the time Dr. McDermott wrote that, plaintiff said, "The same as it is now, the abdominal cramping, the pain, and at that time I was having rapid diarrhea and rapid weight loss, like 220 pounds to 185 pounds in 30 days." (Tr. at 80). The medical records do not support this contention. The ALJ pointed out that plaintiff's weight had been stable for at least three years, plaintiff said, "Well, somewhat stable. It varies anywhere from 10 to 20 pounds every 2 to 3 months." (Tr. at 80).

Plaintiff said he could not work now because his medication makes him forget things and he has to urinate about every 30 minutes (Tr. at 80-81). Plaintiff was asked why doctors have said they would not release plaintiff to return to work (Tr. at 81).

A.     Because of my medical condition.

Q.     Who said that and based on what, what --

A.     Dr. Page McDermott based on the reports he got from Dr. McGowan at KU Med Center.

Q.     Did you ever go back to him in the last four years and ask if he would release you to work?

A.     Dr. McDermott, yes.

Q.     Well, I don't have any verification that you've been seeing him.

A.     I saw him until '07 and that's when I had to move over here when I lost my house, farm property.

Q.     And now you're living on your wife's farm?

A.     My wife's family farm.

Q.     Okay. Have, have there been any doctors at your local clinic who have refused to let you work?

A.     There have been -- I have not been able to see a doctor. They refuse to see me because I don't carry insurance.

17

Q.    Well, you've been going in and getting Neurontin.  Is that from the nurse?

A.    I went in one time.

Q.    You've only seen a nurse one time?

A.    Nurse, and I saw a physician's assistant and they got the records from Dr. McDermott showing that I had been on that and as a pain management and they were to continue the pain management because that's what the physician's assistant specialty was.

(Tr. at 81-82).

Plaintiff testified that in the past two years he had only seen a nurse or physician's assistant one time because he could not get anyone to see him (Tr. at 82).

Q.    Well, at that time you've continued to tell them that you were waiting for a pancreas transplant. Why do you say that to the doctor or the nurse?

A.    Your Honor, excuse me, I was told I needed a pancreas.  I have never stated anywhere that I was on a waiting list.  I do not know where that has came from.  I was told that I needed a pancreas from Dr. McGowan and then that's what Dr. McDermott also said.

(Tr. at 83).

Plaintiff had a mental evaluation in 2004 or 2005 (Tr. at 83).  He was not put on any medication or given any kind of mental health treatment (Tr. at 83).  Plaintiff testified that he is not alleging any mental impairment (Tr. at 84).

Plaintiff testified that Dr. McGowan and Dr. McDermott both told plaintiff he needed a new pancreas (Tr. at 83).  The medical expert pointed out that there is nothing in the doctors' records indicating that plaintiff needs a new pancreas (Tr. at 84).  Plaintiff said the doctors would not see him again until he got insurance (Tr. at 84).

Plaintiff has rheumatoid arthritis in both his knees and both his hips (Tr. at 85).  Dr. McDermott made that diagnosis (Tr. at 85).  If he gets over-exerted, he cannot do anything or even move for a day or two (Tr. at 86).

2.    **Medical Expert's testimony.**

Morris Alex, M.D., testified at the request of the ALJ (Tr. at 86).  The ALJ explained to Dr. Alex that "DDS was never able to formulate an RFC because . . . they did not feel they had the evidence. And we've spent about three years trying to track it down.  Most successfully we were able to get a consultative exam recently so I would ask you to consider that as well as the other evidence in the file." (Tr. at 87).

Dr. Alex testified that there is no evidence in the file for the diagnosis of pancreatitis or pancreatic insufficiency (Tr. at 89).  "[T]here is repeated statements that the claimant states he has pancreatic insufficiency.  And there's  repeated statements that he's been recommended for a transplant. And there is no laboratory work. There's no doctor who has made that statement in the file.  The statement only comes from the claimant." (Tr. at 89).

The record shows that plaintiff suffered from abdominal pain and had a trigger point injection with significant improvement which suggests myofascial pain (Tr. at 90, 92). Plaintiff's abdominal pain may be muskuloskeletal or myofascial; however, he was not able to get additional injections because he had no insurance (Tr. at 90).  "And that may be a cause of a lot of abdominal pain." (Tr. at 90).  "[T]he nerves that supplied that anterior abdominal wall there may be encroachment on the nerves and that's why they get trigger, they get trigger points.  And that was relieved when he got the injections." (Tr. at 93).  Plaintiff's abdominal pain does not meet a listing (Tr. at 90).

Plaintiff's knee and hip conditions are not severe impairments (Tr. at 90).  His obesity is not a severe impairment (Tr. at 90).

Q.      So you're finding him to have no severe impairment?

A.      Right.

Q.      And you would impose no work restrictions?

19

A.      I would have to go along with the consultative examination which accepts that the claimant has diarrhea. But there is no, no, there was no negative, never been any findings to account for it and that was one of the reasons I asked, asked if there had been mental health follow up (Tr. at 91).

Q.      Right. Well, and this, quite frankly, is one reason this case has taken so long to develop is we've tried to see if there was any, any potential limitations there. This doctor seems to suggest the claimant could do at least light work. . . . He says 20 pounds. Do you think that would be reasonable?

A.      I think it's reasonable from the record.

(Tr. at 90-91).

Dr. Alex agreed with the consultative examiner that plaintiff could sit for eight hours and stand and walk for four hours each (Tr. at 91). He believes plaintiff can do light work, but does not think he could do medium work since he probably cannot lift 50 pounds (Tr. at 96). Plaintiff's frequent diarrhea has never been established with any proof, only his subjective reports (Tr. at 91). Dr. Alex would not impose a restriction for frequent bathroom breaks (Tr. at 91-92). There is no verification that he has diarrhea, and Dr. Alex agreed with the consultative examiner that plaintiff's subjective complaints far exceed any objective evidence (Tr. at 94, 95). The consultative examiner noted that plaintiff had an "exaggerated response to pain with guarding out of proportion to what was expected." (Tr. at 95).

At the conclusion of the hearing, plaintiff's attorney asked Dr. Alex if he believed a psychological consultative examination would be prudent:

A.      I believe if it, if it would help the court make a decision, that with an MMPI.

ALJ:    I'm not going to do that because this case is already 850 days old. . . . And this is an instance where the claimant has had, since he saw me in April, he has not sought any help and I'm not going to further delay the case by seeking psychological evaluations when he said he does not have a psychological problem. So I, I'll . . . [deny] any request for a consultative psychological evaluation.

(Tr. at 96).

C.    *SUMMARY OF MEDICAL RECORDS*

On November 17, 2004, plaintiff saw radiologist Melissa Rosenquist, M.D., for an abdominal series (Tr. at 330). Dr. Rosenquist found no acute diseases in the chest or abdomen.

On November 18, 2004, plaintiff saw James McDermott, D.O., at Bartlesville Surgery Center for nausea and vomiting (Tr. at 360). He had been in the emergency room the day before. His lab work was "completely normal." Plaintiff weighed 216 pounds. Plaintiff's physical exam was normal. The doctor wrote a note to keep plaintiff off work until Monday, the day of his follow-up exam.

On November 22, 2004, plaintiff saw Dr. McDermott complaining of an upper respiratory infection (Tr. at 360). "The patient is a pack a day smoker." Plaintiff weighed 217 pounds. Plaintiff's physical exam was normal except some generalized abdominal tenderness. He was diagnosed with a sinus infection and upper respiratory infection.

On November 23, 2004, abdominal series x-rays, done due to complaints of abdominal pain, nausea and vomiting, were normal (Tr. at 359).

On November 24, 2004, plaintiff saw Dr. McDermott for a recheck (Tr. at 358-359). He reported continuing crampy lower abdominal discomfort and watery stools alternating with soft stools. Plaintiff weighed 217 pounds. "Soft and described diffuse tenderness in the lower quadrants, as well as the epigastrium on initial manual palpation. This was, however, not [a] consistent exam, as unable to reproduce discomfort when patient [was] distracted. There is no guarding [muscles contract as pressure is applied], rigidity [rigid abdominal wall which indicates peritoneal inflammation] or rebound [release of pressure causes pain]. Bowel sounds were normal and present." Dr. McDermott recommended checking stool cultures. Plaintiff was given a note that he may return to work "on Monday."

21

On November 29, 2004, plaintiff was seen at Dr. McDermott's office (Tr. at 357-358). He complained of diarrhea. "He states that he has had this for some time; for over a month." Plaintiff reported having four to five diarrhea stools daily with no association with food intake. "He states that he does have 3/4 to one pack of cigarettes per day and does drink 4-5 caffeinated beverages a day." Plaintiff weighed 215 pounds. Although plaintiff stated that he gave his wife a stool sample to take in, no stool sample had actually been submitted. "The patient was instructed that it is necessary for us to have a sample if we are to continue with his evaluation."

On December 2, 2004, plaintiff saw Dr. McDermott and complained of abdominal pain, nausea, vomiting, diarrhea, and an inability to eat (Tr. at 357). He reported running a fever at night, but he did not have a fever at the doctor's office that day. Plaintiff's physical exam was normal including positive bowel sounds, except that he had slight tenderness in his abdomen. He was told to have a CT scan. "No work until Tuesday" which was the day of his follow-up appointment with Dr. McDermott.

On December 3, 2004, plaintiff underwent a CT of the abdomen and pelvis (Tr. at 331). His liver and bile ducts were normal. The pancreas, aorta, and periaortic regions were normal. The kidneys were functioning properly with no evidence of obstruction. He had no adrenal masses. There was no bowel obstruction, focal masses or inflammation. He had no incidental masses, adenopathy (enlargement of a lymph node), or ascites (excess fluid in the space between the tissues lining the abdomen and abdominal organs, i.e., the peritoneal cavity). The impression was "Normal CT of the abdomen and pelvis."

On December 7, 2004, plaintiff saw a physician's assistant in Dr. McDermott's office for a recheck on his "abdominal discomfort and his chronic diarrhea" (Tr. at 356). Plaintiff weighed 211.75 pounds. His physical exam was normal except he was diffusely tender

22

throughout his abdomen. "I did consult with Dr. McDermott. We are going to set the patient up for a colonoscopy with Dr. Kirkpatrick."

On December 7, 2004, Dr. McDermott's physician's assistant wrote a letter to Stephen Kirkpatrick, M.D. (Tr. at 334). "I believe you done [sic] a colonoscopy on this patient sometime in the past 10 years for GI bleed. He has been complaining of ongoing abdominal discomfort and chronic diarrhea for the last three weeks for [sic] so. We have done stool cultures, lab work and CT scan of the abdomen which thus far has [sic] all been unremarkable." Plaintiff was scheduled for a colonoscopy with Dr. Kirkpatrick.

On December 9, 2004, plaintiff saw Dr. Kirkpatrick (Tr. at 327-329). Plaintiff complained of severe abdominal pain and cramping, and Dr. Kirkpatrick was to evaluate him for underlying colitis.[4] Dr. Kirkpatrick performed a colonoscopy with biopsy. His impression was, "Essentially normal colonoscopy without evidence of an active colitis." There was no active inflammation.

On December 13, 2004, Dr. McDermott received the results of plaintiff's latest tests -- complete blood count virtually unremarkable, stool cultures were normal, CT of the abdomen and pelvis were normal (Tr. at 355).

On December 14, 2004, plaintiff saw Dr. McDermott and continued to complain of abdominal discomfort (Tr. at 355). He had had a colonoscopy and it was normal. Plaintiff's physical exam was normal except diffuse tenderness throughout his abdomen. He was assessed with abdominal pain of unknown etiology. "We set the patient up to see Dr. Kirkpatrick. . . . Note written stating patient can return to work after his appointment with Dr. Kirkpatrick on 1-05-05." Dr. McDermott's physician's assistant wrote a letter to Dr.

---

[4]Inflammation of the large intestine.

23

Kirkpatrick (Tr. at 333). The letter thanked Dr. Kirkpatrick for performing a colonoscopy recently and noted that it had been normal. He also pointed out that a CT scan of the abdomen was normal as well. "The patient continues to have abdominal pain, unknown etiology at this time."

On December 20, 2004, plaintiff saw Michael Lievens, M.D., a gastroenterologist (Tr. at 366). However, only the second page of a two-page record appears in this transcript.

From January 12 to January 13, 2005, plaintiff was a patient at Wesley Medical Center for evaluation of abdominal pain (Tr. at 371-381). He reported that he had lost 35 pounds since November. His weight was listed as 208 pounds (Tr. at 376). Plaintiff's last recorded weight in November was 215 pounds -- a difference of seven pounds. "He has had a rather extensive workup which to date has been unrevealing. He had a colonoscopy and an EGD which did not demonstrate any specific pathology. He had an MRCP of his abdomen which was normal. He had a sonogram of his gallbladder which showed a small polyp, otherwise was normal. He had a HIDA scan of his gallbladder which was normal and showed an ejection fraction of 91%. He had an enteroclysis study which was normal, and he had an angiogram of his mesenteric vasculature done this morning which was normal. Despite this, he complains of persistent, pretty significant right upper quadrant pain that is there all the time."

Plaintiff reported a previous diagnosis of arthritis. He reported smoking 3/4 pack of cigarettes per day and drinking minimal amounts of alcohol. Plaintiff reported that his father died two years earlier at age 72 after similar significant right upper quadrant abdominal pain which went undiagnosed. Plaintiff said an autopsy was performed on his father, but the father's widow has not permitted plaintiff to see any of the records. Plaintiff was observed to be in no acute distress. His exam was normal except some right upper quadrant tenderness. Plaintiff reported that he does not often feel sad or depressed, does not often feel anxious or

24

stressed, does not have difficulty sleeping. "A mesenteric angiogram was done, which was normal. He then had a plain diagnostic laparoscopy. Anesthesia discovered a murmur. As a result he had an echocardiogram, which was normal. The diagnostic laparoscopy was performed, which failed to demonstrate gross pathology."

On January 31, 2005, plaintiff saw Dr. McDermott for a follow up (Tr. at 354). "He has quite the bizarre history. We initially had sent the patient up to Dr. Cusick for an avascular necrosis that was found coincidentally while doing a TI work-up. Dr. Cusick referred the patient to Dr. Nold, general surgeon, who was worried about obstruction of the gallbladder neck, however, sonogram was negative. Patient was then sent to Dr. Lievens, gastroenterologist. MRI of the abdomen was negative. HEPA scan was negative. EGD showed that even though the patient had not eaten for two days that his stomach was full of undigested food. Dr. Lievens believes this is related to a bowel obstruction. He was sent for a small bowel follow-through which is normal. He was then taken for a mesenteric angiogram which was negative on the 11th of January. Dr. Nold then took the patient to the operating room for an exploratory laparoscopy. No pathology could be noted. Patient was then sent to Dr. Ain for lumbar sympathetic block followed by a celiac block. Patient advises that it helped for nine hours, but then the pain was back. The patient's father died of similar symptoms last year. Patient continues to have abdominal pain after eating. He has had biopsies. He has been scoped." Plaintiff was taking Prevacid (to reduce stomach acid), Celebrex (treats osteoarthritis), Amitriptyline (antidepressant), Neurontin (treats seizures and nerve pain), Creon (improves digestion of food), and Levsin (treats gastro-intestinal conditions). He weighed 207 pounds. He was assessed with abdominal pain etiology unknown, and anxiety. Plaintiff was concerned he was going to die. "There was a problem with obtaining his father's records as evidently the stepmother has blocked the records. I have advised him to have one of

25

his specialty physicians in Wichita contact his father's family physician to see if they can find out what actually happened to his father in regard to his demise."

On February 21, 2005, plaintiff saw Dr. McDermott (Tr. at 353). Plaintiff said his right arm was no longer bothering him. Dr. McDermott recommended plaintiff see Dr. Paul Genilo for a neurological consultation.

On March 8, 2005, plaintiff saw Dr. McDermott and indicated he was not much better but was planning to see Dr. Genilo on March 24, 2005 for a neurology consult (Tr. at 353). Plaintiff weighed 206 pounds. His exam was normal including bowel sounds, except he had tenderness "everywhere to even lightest touch."

On March 16, 2005, Dr. McDermott learned that plaintiff's alkaline phosphatase test was normal, his liver function was normal, his bone fractions were normal, his placental fractions were normal, and intestinal fractions were normal (Tr. at 352).

On March 21, 2005, plaintiff failed to show for an appointment with Dr. McDermott (Tr. at 352).

On March 31, 2005, plaintiff saw Dr. McDermott (Tr. at 351). "The idea is to increase the patient's Neurontin to maximum if necessary. The patient advises me that he doesn't think it is going to work. We did ask him to increase his Neurontin from 300 mg qid [four times a day] to 600 mg in the a.m. and then 300 mg the other three times during the day for two weeks and then increase to 600 mg the first two doses of the morning and the 300 mg in the evening. He said he wants to proceed with Rhizotomy by Dr. Ain. He is also talking about Billroth or some sort of duodenal bypass." Plaintiff weighed 207.5 pounds. Dr. McDermott said he would wait to hear from the specialists plaintiff planned to contact about this procedure.

On April 5, 2005, plaintiff went to the emergency room and said he went from sitting down to standing up and it felt like he pulled something in his abdominal wall (Tr. at 451-452). X-rays of his abdomen were normal. He was given pain medication and was told to call his physician tomorrow for further evaluation.

On April 13, 2005, Rodney Jones, M.D., of the Midwest Surgery Center, saw plaintiff after having been referred by Dr. Lievens (Tr. at 393-394). Dr. Jones observed that defendant was a pleasant man who was alert and oriented times three. He performed a right celiac plexus block. That same day, Dr. McDermott received a letter from Dr. Genilo advising that he does not have further testing or treatment that have not already been employed (Tr. at 350). "He mentioned Neurontin, possibly the addition of a tricyclic anti-depressant. If they are not helpful then he may need to go see someone for a rhizotomy.[5]"

On April 20, 2005, Dr. Jones performed a nerve block (Tr. at 392). He reported that after the previous block, he experienced complete pain relief for eight hours.

On April 26, 2005, Dr. McDermott received a letter from MetLife indicating that plaintiff's short-term disability benefits had been withdrawn effective March 28, 2005 (Tr. at 350).

On April 28, 2005, Dr. Jones performed a nerve block (Tr. at 391). He noted that after the previous block, plaintiff had several hours of significant improvement followed by a gradual return of right upper quadrant pain.

On April 29, 2005, Dr. McDermott called in a prescription for Darvocet (used to relieve mild to moderate pain) with two refills (Tr. at 350).

---

[5]Surgical incision into the roots of spinal nerves, especially for the relief of pain.

On May 6, 2005, plaintiff was seen by Dr. Jones who performed myofascial trigger point injections (Tr. at 390). After his first injection, plaintiff's right upper quadrant pain was significantly lessened.

On May 16, 2005, plaintiff saw Dr. McDermott for a sinus infection (Tr. at 349-350). He also continued to have considerable abdominal pain and said it "had to do with some nerve or something and he has an appointment to see Dr. Rodney Jones for testing on that." Plaintiff weighed 198.25 pounds. His physical exam was normal including positive bowel sounds but with tenderness to palpation throughout the abdominal region. He was treated for a sinus infection.

On May 19, 2005, plaintiff was seen by Dr. Jones (Tr. at 389). Dr. Jones performed flouroscopic-directed right paralumbar sympathetic block and myofascial trigger point injections. "At this point he has noted a significant improvement of the right upper quadrant pain and subcostal tenderness."

On May 23, 2005, plaintiff saw Dr. McDermott for a follow up (Tr. at 348-349). His pain continued but was improved somewhat. He weighed 199.5 pounds. His physical exam was normal including positive bowel sounds. "Dr. Lieven and Dr. Genilo, I believe, are in agreement that this patient may be a candidate for going off to the Mayo Clinic to see if we can in fact establish a definite diagnosis. Prescription called to Wal-Mart in Independence for Neurontin 300 mg 1 po [orally] qid [four times a day] #120 with 2 refills." A second dictation included the following addendum: "Dr. McDermott did request that I assist him with completing an insurance form for patient's short term disability. We did do this and a copy has bee placed in the patient's chart. Also at the patient's request we faxed a note regarding the fact that the patient is not able to return to work at this time to Cessna Aircraft Human Resources."

28

On June 2, 2005, Dr. Jones performed a lumbar paraspinal sympathetic block and myofascial trigger point injections (Tr. at 388). Plaintiff was told to come back in two weeks for a repeat block. He did not return as directed.

On June 13, 2005, Dr. McDermott called in a prescription for Neurontin 300 mg 1 tablet as directed.

On June 22, 2005, plaintiff canceled his appointment with Dr. Lievens, a gastro-enterologist, claiming that his car broke down (Tr. at 363).

On June 30, 2005, plaintiff saw Dr. McDermott and complained that he was no better (Tr. at 347). His weight was 192.5 pounds; his physical exam was normal including positive bowel sounds. He was assessed with abdominal pain, etiology questionable; doubtful reflex sympathetic dystrophy; previous history of avascular necrosis of the right and left hip, questionable; previous right upper extremity paresthesia[6] secondary to right disc bulge of C6-7; degenerative disc disease; previous suspicions for inflammatory arthritis. "Patient tells us that his employer has removed his benefits."

On July 13, 2005, plaintiff canceled his appointment with Dr. Lievens, a gastro-enterologist, claiming that he was stuck on a road that was being repaved (Tr. at 363).

On July 23, 2005, plaintiff was seen in the emergency room (Tr. at 444). He was driving a lawn mower/tractor which turned over on him in a ditch. He was given crutches and told to use ice and elevate his leg for the next 48 hours and follow up with his primary care doctor on Monday.

On July 25, 2005, plaintiff saw Dr. McDermott for a follow up after an ER visit (Tr. at 346). "[His] riding lawn mower has rolled over on him, striking his right femur over the distal

---

[6]A skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause.

medial aspect. Also caused some swelling in the knee. X-rays done in the ER show no obvious fracture or dislocation." Plaintiff said he was able to control the pain reasonably well with the routine medication he is on "for another condition". The following day Dr. McDermott completed and signed a supplemental claim report for disability insurance for plaintiff (Tr. at 346).

On August 1, 2005, Dr. McDermott noted plaintiff's x-rays from July 23, 2005, of his left knee and left femur were negative (Tr. at 345).

On August 4, 2005, plaintiff saw Dr. McDermott for a follow up on his knee (Tr. at 345). "He is much improved in that regard. However his abdominal pain persists and he continues with Dr. Jones for pain management." There is no evidence that plaintiff had seen Dr. Jones, however, since June 2, 2005, when Dr. Jones told plaintiff to return in two weeks. Plaintiff weighed 193.5 pounds. His physical exam was normal including positive bowel sounds, except he had generalized tenderness to palpation in the abdomen. He was told to continue with his current treatment.

On September 1, 2005, plaintiff saw Dr. Lievens, a gastroenterologist (Tr. at 362). "He has chronic right-sided abdominal pain and intermittent diarrhea. When he has diarrhea, he says that things just run right through him with no stopping. Undigested food ends up in the toilet. He has been through an enormous previous evaluation that I reviewed with him in detail today. He has had extensive efforts provided by Dr. Rod Jones of pain management to try and control this without using narcotics." Plaintiff weighed 204 pounds. "He is a comfortable and healthy appearing gentleman in no acute distress." His physical exam was normal, including his abdominal exam: "Normal active bowel sounds. It is soft, flat, nondistended, and nontender without palpable mass or hepatosplenomegaly." Plaintiff was assessed with chronic right-sided abdominal pain and intermittent diarrhea. "I have done an exhaustive evaluation

30

and found nothing to explain this."

On September 6, 2005, plaintiff saw Dr. McDermott for a follow up (Tr. at 344-345). "He has been diagnosed with 'chronic functional abdominal pain syndrome.' He will be seeing a motility specialist up at KU Med Center in Kansas City in the near future." Plaintiff weighed 202.5 pounds. He had a normal physical exam including positive bowel sounds.

On November 8, 2005, plaintiff saw Dr. McDermott for a follow up (Tr. at 344). "He seems to be stable at this time. He has some minor complaints." His weight was listed at "211 up from 180;" however, there is no notation in Dr. McDermott's records (or anyone else's) where plaintiff weighed 180 pounds. In fact, the lowest weight recorded to date was 192.5 pounds -- the record shows that he gradually went down from 215 pounds to 192.5 and then gradually went back up again. His physical exam was normal. "Patient will be seeing a specialist at Kansas City, KU Med Center, as referred by Dr. Lievens in Wichita. Appointment is the 20th of December."

On November 28, 2005, plaintiff saw Dr. McDermott for sinus draining and cough (Tr. at 343-344, 405-406). Plaintiff weighted 203 pounds. Dr. McDermott noted that plaintiff is a smoker. Plaintiff's physical exam was normal, including positive bowel sounds, although he had tenderness to palpation generally. Dr. McDermott told plaintiff he may have pneumonia or bronchitis and that he needed to have a chest x-ray, complete blood count, and a basic metabolic profile. "He refused stating he did not have the money and was not willing to do those tests at this time." Dr. McDermott provided defendant with samples of Avelox and was told to go to the emergency room immediately if he got worse.

On December 20, 2005, plaintiff was seen at KU Medical Center (Tr. at 385-386). He reported chronic abdominal pain with cramps about 30 minutes after eating, the pain becomes extreme, and he has alternating constipation and diarrhea. He said he was not working

31

because of his pain. "He was unable to return to work and Cessna [illegible] dismissed him in July because he was requiring narcotics and neurontin to help the pain and this was not conducive to working although it did help the pain somewhat. . . . Chronic pancreatitis could be a [illegible] diagnosis and an endoscopic ultrasound would define any pancreatic pathology and look at gallbladder and offer another chance for Celiac block." That same day Dr. McDermott made a note in plaintiff's records that some doctor from Kansas City was going to do an endoscopic evaluation of plaintiff's pancreas. "He is not quite sure what is going on."

On January 17, 2006, plaintiff was seen at KU Medical Center by Dr. Richard McCallum, Gastroenterology/Hepatology (Tr. at 384, 427). He weighed 208.5 pounds. There was no evidence of chronic pancreatitis but two small gallstones had been found. Plaintiff reported continued abdominal pain despite taking Prevacid, Neurontin and Darvocet. The plan was for Jameson Forster, M.D., to perform a laparoscopic procedure, and then review with his local doctor the possibility of his hips narrowing, lending to this pain.

On January 23, 2006, Jamison Forster, M.D., wrote a letter to Dr. McDermott who recorded this in plaintiff's medical file (Tr. at 341, 403). "Bottom line in regard to this dictation is that Dr. Forster has no clear idea why this patient is so ill and what is the cause of his lower abdominal pain. The patient feels that this clearly runs in his family. Dr. Forster is doubtful of gallstones playing a role, but did suggest gallbladder ejection fraction and to see if there is pain when the CCK is given. Before Dr. Forster would consider operating, he would have to review his previous workup, which is quite extensive."

Dr. Forster's letter reads in part as follows:

His story is very unusual. He is a 50 year old gentleman. His problems began in November, 2004; after pheasant hunting, he developed a constant lower abdominal pain that has not been fully explained. This pain has forced him to quit working. He currently is not only without a job; he is also without insurance. . . . I did not have

much of his long work up; most of his surgeries[7] and work up took place in Wichita. His abdominal pain radiates around both flanks and is not necessarily related to eating. He has had a mesenteric arteriogram, endoscope ultrasound, and even an exploratory laparotomy. No etiologies have been found, but he does have gallstones. It is not known whether the gallstones play a role in this abdominal pain. . . . He has smoked three quarters of a pack for 25 years and he does drink alcohol.

On physical exam, he was somewhat disheveled and unkempt. He weighed 209 pounds (He had been 240 when he was healthy; his weight has dropped to low as 185).[8] . . . Abdomen was soft. He has normal bowel sounds. Neither liver nor spleen was enlarged and he did have some tenderness in his right upper quadrant. . . .

I really have no clear idea why this man is so ill and what is the cause of this lower abdominal pain which he feels clearly runs in his family. It all seems somewhat strange to me. I doubt that his gallstones play a role but it may be useful to do a gallbladder ejection fraction; see how well his gallbladder empties; and determine if there is pain when the CCK is given. Before I would consider operating, I would have to review his previous workup. I will be happy to sit down and talk to you about this case and get your thoughts about the next step.

(Tr. at 417-418).

That same day Dr. Forster wrote an identical letter to Dr. McCallum (Tr. at 421-422; 425-426).

On January 26, 2006, plaintiff saw Dr. McDermott for a follow up (Tr. at 343, 405). "He is having a continued workup at KU Medical Center in Kansas City. He does have Barrett's esophagus.[9] He continues with his chronic unexplained abdominal pain. . . . I would like to see the patient back in two months. He continues in a disable [sic] status at this time."

On February 22, 2006, plaintiff called Dr. McDermott requesting a refill on Neurontin (Tr. at 343, 405). "He told us that Dr. McCallum at Kansas City had changed his dose to 600

---

[7]It is unclear to what "surgeries" Dr. Forster was referring.

[8]The highest and lowest weights actually recorded to date in plaintiff's medical records were 217 and 192.5 -- a variance of 24.5 pounds, rather than the 55 pound variance as described by plaintiff.

[9]The lining of the esophagus is damaged by stomach acid.

33

mg. He is to take those 6 times a day. Prescription was written for Neurontin 600 mg. 6 times a day, #180 with 6 refills. The following day, Dr. McDermott's office called in a prescription for Neurontin with 12 refills (Tr. at 342, 404).

On March 27, 2006, plaintiff failed to show for his appointment with Dr. McDermott (Tr. at 342, 404).

On April 16, 2006, plaintiff saw Dr. McDermott for a follow up (Tr. at 342, 404). Plaintiff said his Neurontin at maximum dose was just "keeping the edge off of his abdominal pain." Plaintiff weighed 201 pounds. Dr. McDermott's assessment was as follows: Chronic functional abdominal pain syndrome; doubtful reflex sympathetic dystrophy; previous questionable history of avascular necrosis, right and left hip; previous right upper extremity paresthesia secondary to right disc bulge C6-7; previous suspicions, but unproven, for inflammatory arthritis. Plaintiff was to continue following up with Dr. McCallum.

On June 19, 2006, plaintiff saw Dr. McDermott for a follow up (Tr. at 341, 403). He weighed 208 pounds. "This patient's body odor was horrible. I advised the patient that he needs to bathe before he comes in before his doctors appointment." His physical exam was normal. He was assessed with "horrible body odor" and "bizarre chronic abdominal pain with a previous consideration for reflex sympathetic dystrophy, followed by KU Medical Center in Kansas City possibly working toward exploratory surgery at KU." Plaintiff's wife reported that plaintiff had a "fruity breath" like ketoacidosis.[10] Dr. McDermott ordered a complete blood

---

[10]When cells do not get the glucose they need for energy, the body begins to burn fat for energy, which produces ketones. Ketones are acids that build up in the blood and appear in the urine when the body does not have enough insulin. They are a warning sign that diabetes is out of control or that the patient is getting sick. High levels of ketones can poison the body. When levels get too high, the patient can develop diabetic ketoacidosis. Ketoacidosis is rare in patients with Type 2 diabetes; more common in people with Type 1 diabetes.

count, basic metabolic profile, 2 hour post prandial blood sugar test, hemoglobin A1c (tests blood sugar levels over the past three months), and a urinalysis.

On June 22, 2006, plaintiff saw Dr. McDermott for a follow up (Tr. at 340, 402). Dr. McDermott was concerned about diabetes due to a fruity odor to plaintiff's breath. His fasting blood sugars were normal, his Hemoglobin A1c was normal. Basic metabolic profile was "entirely within normal limits." He was assessed with questionable hyperglycemia and "chronic abdominal pain, etiology still to be determined."

On July 5, 2006, Dr. McDermott noted that plaintiff's complete blood count was normal, his fasting glucose and Hemoglobin A1c were normal, and a urinalysis was essentially normal (Tr. at 340, 402).

On July 6, 2006, plaintiff failed to show for his appointment with Dr. McDermott (Tr. at 340, 402).

Nine months later, on April 12, 2007, plaintiff was seen by Dr. McDermott for medication refills (Tr. at 401). "The patient states that he is to be scheduled for a pancreatic transplant. He has been evaluated by Dr. McCallum at KU in the digestive mobility department and as soon as the patient gets on disability and medicaid, he feels he will have a transplant available." Plaintiff weighed 209 pounds. His physical exam was normal. "The patient is alert and oriented and with a clean appearing body habitus." He was assessed with pancreatic failure and given a prescription for Neurontin and Darvocet (no refills). "The patient was instructed to return to the clinic in six months at which time, he stated, he hoped he had a new pancreas by then. He states that Dr McCallum is following him at KU and will send us information regarding this patient and the plan."

Six months later, on October 11, 2007, plaintiff was seen by the Dr. McDermott for a follow up (Tr. at 400-401). "He has been advised by Dr. McCallum, KU Medical Center that

he has 'pancreatic failure.' This was diagnosed through the digestive mobility department. We do not have any correspondence from Dr. McCallum in that regard. Nevertheless, the patient advises that when he gets on disability or has medicaid then he will be a candidate for pancreatic transplant." Plaintiff weighed 217 pounds. His physical exam was normal; he had no apparent abdominal tenderness. Plaintiff's blood was drawn for lab work which was all normal.

On October 25, 2007, plaintiff was seen by Dr. McDermott (Tr. at 399-400). He reported abdominal discomfort intermittently and chronic diarrhea. He weighed 218 pounds. His physical exam was normal. His abdomen was nontender and he had positive bowel sounds. The doctor assessed:

> "Pancreatic failure"
>
> Gallbladder disease?
>
> Chronic abdominal pain secondary to above?

Plaintiff was told to come back in three months after he had his liver function tested and had a follow up with KU Medical Center.

On January 25, 2008, the Dr. McDermott tried to call plaintiff about his missed lab appointment, but his phone number was no good (Tr. at 399). A letter was sent to him telling him to reschedule his appointment.

On February 28, 2008, the Dr. McDermott noted that the letter that was sent to plaintiff reminding him to reschedule his lab appointment had been returned since plaintiff was no longer living at that address (Tr. at 399).

One year and five months after his last doctor appointment, on March 16, 2009, plaintiff was seen by a physician's assistant at Ozarks Community Hospital (Tr. at 433). He was assessed with pancreatic failure. His physical exam was normal, including his abdominal

36

exam which showed no tenderness, no mass, and normal bowel sounds. His affect, mood, judgment and memory were all normal.

On April 15, 2009, plaintiff was seen by Christopher Billings, M.D., at Ozarks Community Hospital (Tr. at 431). "Mr. Standfast suffers from pancreatic failure and needs a local primary care provider to continue his Neurontin 600 mg 1 p.o. [by mouth] 5 times daily. Mr. Standfast states that he is unchanged and continues to relay that he is waiting for a pancreatic transplant and will get such when his condition worsens and becomes a life or death situation or when he gets medical coverage that will approve such." Plaintiff was in no acute distress. He weighed 216 pounds. His physical exam was normal, his psychologic exam was normal including his memory. Dr. Billings refilled plaintiff's Neurontin.

On August 22, 2009, plaintiff was examined by Anthony Zeimet, D.O., at the request of the ALJ (Tr. at 464-467). Plaintiff's allegations were, "pancreatic failure to extreme pain all over his abdomen; especially after a meal, he may pass out. Extreme fatigue and skin smells like ketones. He can no longer control his bowels or urinary habits." Plaintiff described his abdominal pain and reported that it was better after having spinal blocks but he had not gotten those in over four years due to lack of insurance. He said he has three to seven loose stools a day and at times has to rush to the bathroom because of their frequency.

> On a self-questionnaire, the patient states that in an 8-hour day, he can sit for an hour at a time, stand for an hour at a time, and walk for about 45 minutes at a time. He states he can lift and carry about 10 pounds. He can walk 2-3 blocks before he needs to stop and rest. He can climb stairs. He does not require anything to help him walk. . . . He does admit to smoking. He does not drink alcohol, and he can drive a car.

> \* \* \* \* \*

> Weight is 208 pounds. . . . The patient is alert. He is in no apparent distress. He is able to get on and off the exam table and up and out of chair without much difficulty. . . .

> ABDOMEN: Positive bowel sounds. No pain was elicited while I used the stethoscope to listen to his abdomen of which I pressed into the abdomen with the device; however,

37

upon palpation, the patient had an exaggerated response to pain with some guarding that was out of proportion to what I was expecting considering he really had no pain while I listened to his abdomen.

* * * * *

MEDICAL RECORDS: I do not have any pertinent documentation including lab or radiology results to review.

DIAGNOSES:
1.     Chronic loose stools likely secondary to pancreatic insufficiency.
2.     Pancreatic insufficiency/Chronic Pancreatitis. Patient's abdominal pain may be related to inflammation of the pancreas and may improve if he were taken pancreatic enzymes to help with digestion of his food.
3.     Right wrist fusion.
4.     Tobacco abuse.
5.     Questionable episodes of hypoglycemia. Patient reports that he has passed out before. Etiology may be secondary to hypoglycemia due to failure of insulin release from his pancreas following meal ingestion. Without further information; it is quite difficult for me to comment on this further.

IMPRESSION: I do believe the patient gave good effort on exam today. With regard to the ability to work an 8-hour day with normal breaks to sit, stand and walk; I think he actually can work a full 8-hour day. The patient does have some diarrhea, and it is quite frequent. He should have ready access to a bathroom in any work setting that he is in. I am kind of confused as to why he is not on pancreatic enzymes, as this may help his diarrhea/digestion and abdominal pain symptoms. With regard to the ability to lift and carry weight; he self-reports that he can carry about 10 pounds or so. I suspect he can actually carry much more than that, probably 20 pounds on a frequent basis and probably up to 40-50 pounds on an occasional basis. The patient really only had limitation in range of motion in his right wrist. He had a full range of motion with the rest of his body. He was able to squat for me. His gross and fine motor hand grip and grasp are intact. He is able to oppose his fingers. He has the ability to button, zip, and pick up a coin. He does not require any devices for ambulation. His vision is normal, corrected. Hearing is intact. Communication skills are fair. It should be noted that the patient does report that he passes out at times. This may be from hypoglycemia and should be investigated further. If this was controlled, I believe he does have the ability to travel and drive a car.

Dr. Zeimet found that plaintiff can sit for two hours at a time and for eight hours total, stand for one hour at a time and for four hours total, and walk for one hour at a time and for four hours total (Tr. at 469). He can frequently handle and finger with his right hand and continuously with his left hand, and he can continuously reach, feel, push and pull with both

38

hands (Tr. at 470). He can occasionally climb and can frequently balance, stoop, kneel, crouch, and crawl (Tr. at 471).

## V.     *FINDINGS OF THE ALJ*

Administrative Law Judge Jan Dutton entered her opinion on September 29, 2009 (Tr. at 11-20). She found that plaintiff's last insured date was December 31, 2010 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 13). Plaintiff worked after his alleged onset date, but that work activity did not rise to the level of substantial gainful activity (Tr. at 13).

Step two. Plaintiff suffers from abdominal pain of unknown etiology, a severe impairment (Tr. at 13).

Step three. Plaintiff's impairment does not meet or equal a listed impairment (Tr. at 13).

Step four. Plaintiff's subjective complaints are not entirely credible (Tr. at 14-18). Plaintiff has the residual functional capacity to do light work except he would need ready access to bathroom facilities (Tr. at 14). The ALJ noted that although there is no medical evidence substantiating the allegation of occasional diarrhea and urinary frequency, she gave plaintiff the benefit of the doubt and included ready access to bathroom facilities in the residual functional capacity (Tr. at 15).

Plaintiff's attorney requested a psychological evaluation at the hearing; however, in her order, the ALJ denied the request: "[T]he request is denied, in light of the age of the case (request for hearing filed February 27, 2007); the claimant's failure to seek help since the April 1, 2009 hearing; and the fact that the claimant testified that he did not have a mental impairment and was not alleging a mental impairment." (Tr. at 16).

With this residual functional capacity, plaintiff can perform his past relevant work as a laboratory assistant and as an avionics technician as that work is generally performed in the national economy (Tr. at 18).

Step five. Even if plaintiff's residual functional capacity were limited to unskilled, routine, repetitive light work with a Specific Vocational Preparation ("SVP") rating of 1 or 2, and if he needed ready access to bathroom facilities and could not concentrate for extended periods, he could still perform other jobs in the national economy, such as messenger, DOT 230.663-010, with 4,000 jobs in the four-state region of Iowa, Kansas, Missouri, and Nebraska, and 147,000 in the national economy; general office clerk, DOT 245.367-014, with 5,000 jobs in the region and 150,000 in the nation; or production worker, DOT 524,687-022, with 6,000 jobs in the region and 175,000 in the nation (Tr. at 19). Therefore, alternatively, the ALJ found that plaintiff is not disabled at step five of the sequential analysis (Tr. at 19).

VI.    NEED FOR PSYCHOLOGICAL EVALUATION

After asserting from 2006 when he filed his application for disability benefits until 2011 when he filed the brief in this appeal that he was disabled due to pancreatic failure, plaintiff now states that, "The record is replete with extensive diagnostic examinations that have revealed no physical abnormality." (see plaintiff's brief at page 16). Plaintiff argues now that he is disabled due to a somatoform disorder[11] and that the ALJ erred in failing to order a psychological examination.

─────────────

[11]Somatoform disorders represent a group of disorders characterized by physical symptoms suggesting a medical disorder. However, somatoform disorders represent a psychiatric condition because the physical symptoms present in the disorder cannot be fully explained by a medical disorder, substance use, or another mental disorder. Often the medical symptoms patients experience may be from both medical and a psychiatric illnesses. Anxiety disorders and mood disorders commonly produce physical symptoms. These physical symptoms can dramatically improve with successful treatment of the anxiety or mood disorder.

40

The only things in the record to which plaintiff points are (1) a question by the medical expert at the third administrative hearing and (2) a comment by the medical expert at the conclusion of that hearing:

ALJ:     Now we have a medical expert who's going to testify.  His name is Dr. Morris Alex.  And, Dr. Alex, do you have any questions of the claimant before you testify?

ME:     Yes.  Has the claimant ever had any mental health consultation?

(Tr. at 83).  Plaintiff responded as follows:

A.     Yes.

Q.     What, tell us about that.

A.     That was done by the, Dr. Levins, I believe, had that done.

Q.     When was that done?

A.     It would have been done back in, when I seen Levins at Wesley Medical Center, '04 or '05.

Q.     Did they give you any medication or treatment?

A.     None.

Q.     No meds or nothing?

A.     Nothing.

Q.     Okay.  Are you alleging any mental impairment?

A.     No.

(Tr. at 83-84).

Later in that same hearing, the medical expert was being questioned by plaintiff's counsel:

ATTY:  Actually what could cause diarrhea with that frequency with abdominal pain?

ALJ:     Well, there's no verification that he does have this, first of all, it's by his report.  Can we agree that his subjective complaints far exceed any objective evidence?

41

ME:     Yes, as the consultative examiner made that remark.

ATTY:  . . . [F]rom what I could tell from the report, he didn't review his medical records prior to the exam.

ME:     14F, page 4, if counsel will check that, patient had an exaggerated response to pain with guarding out of proportion to what was expected. . . .  So I'm saying there is a -- there may be a psychological problem here that, that the claimant is not cognitive of.

(Tr. at 94-95).

Plaintiff's attorney asked the medical expert if he thought it would be prudent to have a psychological consultative examination.  He responded, "I believe if it, if it would help the court make a decision" (Tr. at 96).

The ALJ denied plaintiff's request at that point for a psychological evaluation. The case on that day was 850 days old, three hearings had been held, plaintiff had not sought any medical treatment during the course of all of those hearings, he had never alleged a mental impairment and in fact specifically denied a mental impairment during this final hearing, his attorney had denied that he had a mental impairment during the second hearing (Tr. at 28) and the request for a psychological exam was not made until the medical expert testified that there was no evidence that plaintiff suffers from any medical impairment.

An ALJ is only required to order additional medical tests and examinations when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 404.1517; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).  The record in this case was sufficient for the ALJ to determine that plaintiff does not suffer from a mental impairment.

Plaintiff consistently denied having a mental health problem and admitted that a previous mental health examination resulted in no recommended treatment.  None of plaintiff's treating or examining physicians suspected that plaintiff's pain was a manifestation

42

of a psychological condition. Every doctor who ever noted plaintiff's psychological condition found that he was normal:

In January 2005 the doctors at Wesley Medical Center noted that plaintiff specifically denied often feeling sad, depressed, anxious, or stressed, and he stated that he does not have difficulty sleeping.

In January 2005 Dr. McDermott assessed anxiety -- the only mental diagnosis in the entire record. Dr. McDermott explained that plaintiff was afraid he was going to die. He was also upset because he could not get his father's autopsy reports as his stepmother was "blocking" him from getting those documents. Dr. McDermott suggested plaintiff have one of his specialists contact the father's doctor to find out what exactly had happened to plaintiff's father. Nothing more appears in this record after this suggestion about plaintiff's father dying from a similar condition.

In April 2005 Dr. Jones observed that plaintiff was pleasant, alert and oriented times three.

In April 2005 Dr. Genilo recommended a tricyclic anti-depressant for plaintiff's pain.

In September 2005 Dr. Lievens described plaintiff as a comfortable and healthy appearing individual in no acute distress.

In April 2007 Dr. McDermott observed that plaintiff was alert and oriented.

In March 2009, plaintiff's affect, mood, judgment and memory were all normal as observed by a physician's assistant.

In April 2009 Dr. Billings conducted a psychological evaluation which was normal, including plaintiff's memory.

The evidence in the record is sufficient to permit the ALJ to determine whether plaintiff suffers from a mental impairment.

Although plaintiff argues that he could be suffering from somatoform disorder, the record also (and perhaps more strongly) supports a finding that plaintiff was simply exaggerating in order to secure disability benefits -- a not-unheard-of notion seeing as how there are regulations to assess each claimant's credibility. It is one thing to say that plaintiff was actually experiencing severe pain symptoms as a result of a mental impairment. However, this record supports a finding that plaintiff lost his job at Cessna, was unable to find another one, and exaggerated his condition in order to get disability benefits.

Not one record from KU Medical Center discusses plaintiff's pancreas as being deficient. Yet plaintiff went around telling his other doctors that he was going to get a pancreas transplant. On June 22, 2006, plaintiff saw Dr. McDermott, then he failed to show up for his next appointment in July. Nine months later, in April 2007, he saw Dr. McDermott for medication refills. Plaintiff had not seen any doctor during that nine months and had not been seen at KU Medical Center since January 2006. Yet he told Dr. McDermott that he was to be scheduled for a pancreas transplant at KU. This is not an example of someone experiencing pain or other physical symptoms as a result of a mental impairment -- it is an example of someone not going to any doctor at all and completely making up a story of a severe condition when he finally had to see a doctor for medication refills.

Another six months passed with no doctor visits of any kind. In October plaintiff saw Dr. McDermott and said he had been told by Dr. McCallum at KU that he was in pancreatic failure. Plaintiff had seen no doctor during that time. He had not been seen at KU for the past year and ten months. There is no way he could have thought he was in pancreatic failure; there is no way he could have misunderstood Dr. McCallum because he had not even seen Dr. McCallum in almost two years.

44

After October 2007, plaintiff missed his follow-up appointments with Dr. McDermott. He went one year and five months without seeing any medical professional. He went to a physician's assistant for medication right before his first administrative hearing in connection with his disability benefits. On April 15, 2009 -- two weeks after the first administrative hearing during which the ALJ took no testimony but continued the hearing because plaintiff had not submitted any records from Dr. McCallum whom he claimed had diagnosed pancreatic failure -- plaintiff saw Dr. Billings. Although plaintiff had not been to a doctor for the past year and a half and had not had an appointment at KU Medical Center in well over two years, he told Dr. Billings that he suffered from pancreatic failure and was awaiting a pancreas transplant. Once again, it is implausible that plaintiff, because of a mental impairment, believed he was in pancreatic failure and was being followed by any physician at KU Medical Center when he had not even been seen at KU for over two years. His explanation during the hearing that they were supposed to call him when they got things figured out was not believable to the ALJ, and the record supports that finding.

The record contains other instances of plaintiff's exaggerations in furtherance of his attempt to secure disability benefits. Plaintiff told doctors at KU that he had been dismissed from Cessna because he required narcotics for pain and he could not perform his job on narcotics. Plaintiff was never prescribed narcotics. In May 2005 Dr. McDermott noted that Dr. Lieven and Dr. Genilo believed that plaintiff should go to the Mayo Clinic; however, there is nothing in either of those doctors' records suggesting that plaintiff go to Mayo -- it appears that too came from plaintiff. Plaintiff testified that his pain, despite treatment, is always an 8 to a 10 out of 10. This type of pain is extremely severe. Yet in no medical record is plaintiff described as being in distress. In fact, every medical record making such a reference shows that plaintiff was pleasant and in no acute distress. Plaintiff clearly testified at the second

hearing that he earned an Associate degree; however, during the third hearing he denied ever having said that.

An ALJ is not required to investigate a claim not presented at the time of the application for disability benefits and not raised at the hearing. Gregg v. Barnhart, 354 F.3d 710,713 (8th Cir. 2003); Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996). It was not until the medical expert stated that there was no evidence that plaintiff suffered from any impairment -- at the conclusion of the third hearing -- that plaintiff developed this new theory of disability. The substantial evidence in the record supports the ALJ's finding that plaintiff's subjective complaints were not credible (i.e., that he was exaggerating the condition of his pancreas); and the record also supports the ALJ's determination that a psychological evaluation was not necessary in order to make a determination about any mental impairment (i.e., it was more likely that plaintiff was exaggerating than that he truly believed he was in pancreatic failure and needed a transplant, a belief based on a mental impairment). The ALJ was not required to order such an evaluation and did not err in refusing plaintiff's last-minute request for such an evaluation.

VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 25, 2012

Case 3:11-cv-05047-REL   Document 13   Filed 06/25/12   Page 46 of 46